**FILED**

Jan 16 2018, 9:06 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Matthew J. Schad
Schad & Schad, P.C.
New Albany, Indiana

Roger L. Pardieck
Karen M. Davis
The Pardieck Law Firm
Seymour, Indiana

ATTORNEYS FOR APPELLEES

John B. Drummy
Crystal G. Rowe
J. Todd Spurgeon
Kightlinger & Gray, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Kimberly S. Earl, Individually
and as Personal Representative
of the Estate of Jerry L. Earl,

*Appellant-Plaintiff,*

v.

State Farm Mutual Automobile
Insurance Company, State Farm
Fire and Casualty Company, and
Sarah Smith Vinnedge,

*Appellees-Defendants*

January 16, 2018

Court of Appeals Case No.
36A01-1703-CT-542

Appeal from the Jackson Superior
Court

The Honorable Bruce Markel, III,
Judge

Trial Court Cause No.
36D01-1411-CT-36

**May, Judge.**

Kimberly Earl, ("Kimberly"), individually, and as the personal representative of the Estate of Jerry L. Earl (collectively, "Earl") appeals the grant of summary judgment in favor of State Farm Mutual Automobile Insurance Company ("State Farm Mutual"), State Farm Fire and Casualty Company ("State Farm Fire"), and Sarah Smith Vinnedge ("Vinnedge") (collectively, "Defendants"). Earl argues the trial court erred when it granted summary judgment in favor of Defendants.

The parties present multiple issues for our review, which we consolidate and restate as:

1. Whether the trial court erred when it granted summary judgment for the Defendants based on the trial court's conclusion Earl's claims were impermissible collateral attacks on an earlier judgment;

2. Whether the trial court erred when it granted summary judgment for the Defendants based on the trial court's conclusion Earl was unjustified in her reliance on State Farm Mutual's representations regarding insurance coverage in the earlier litigation; and

3. Whether the trial court erred when it granted summary judgment for the Defendants regarding Earl's bad faith claim.

We reverse and remand.

# Facts and Procedural History[1]

On September 3, 2008, Jerry Earl ("Jerry") sustained injuries in a motorcycle crash involving a hit-and-run semi driver. At the time, Kimberly and Jerry Earl ("the Earls") had an Uninsured Motorist ("UM") policy with available coverage of $250,000 with State Farm Mutual and a Personal Liability Umbrella Policy ("PLUP"), including available coverage for damage done by an uninsured motorist of $2,000,000, with State Farm Fire. State Farm Mutual offered $40,000 to settle the claim, which the Earls rejected.

On August 10, 2010, the Earls filed a claim against State Farm Mutual for UM coverage benefits for damages Jerry incurred as part of the motorcycle accident, and loss of services, society, and companionship for Kimberly ("UM Litigation"). On January 19, 2011, the Earls served their interrogatories upon State Farm Mutual, with a question stating:

> Describe any policy or policies of liability insurance or any indemnification or insurance agreement in effect which covered or may cover any person or vehicle in connection with the wreck, please state as to each policy:
>
> (a)    The name and address of the insurer;
>
> (b)    The names and addresses of the insureds;

---

[1] We held oral argument on this matter on November 17, 2017, at the French Lick Resort and Conference Center as part of the Defense Trial Counsel of Indiana's Annual Conference and Meeting. We thank both Conference Center staff and DTCI representatives for their willingness to host the oral argument, and we thank counsel for their able presentations.

| | |
|---|---|
| (c) | Other persons covered by the policy; |
| (d) | The number of the policy; |
| (e) | The effective dates thereof; |
| (f) | The amount of coverage; |
| (g) | The limits of liability. |

(App. Vol. V at 7.)  Vinnedge, as a representative of State Farm Mutual, answered the interrogatories.  Her answer included information about only the $250,000 UM policy with State Farm Mutual.

[5]  On November 27, 2012, the jury returned a verdict of $175,000 for the Estate of Jerry Earl[2] and $75,000 for Kimberly individually.  On November 28, State Farm Mutual directed its counsel to divulge information regarding the PLUP policy with UM coverage to Earl's counsel.  On December 3, 2012, State Farm Mutual's counsel provided Earl's counsel a copy of the PLUP policy, which provided for an additional $2,000,000 in UM coverage.

[6]  On January 10, 2013, Earl filed a motion to correct error, requesting the trial court modify the jury's verdict regarding damages awarded to Earl based on State Farm Mutual's "conduct in failing to produce the [PLUP] or information about the policy in discovery and allowing the case to go to the jury after the jury had been given incomplete information about the policy limits."  (App.

---

[2] Jerry Earl passed away from causes unrelated to this case on January 4, 2012, and his Estate, with Kimberly Earl as personal representative, replaced him as a party in the UM Litigation.

Vol. III at 15.) Earl also requested attorney's fees and litigation expenses, alleging State Farm Mutual violated discovery rules.

[7] On January 28, 2013, State Farm Mutual responded to Earl's motion, arguing a new trial was warranted because the trial court erred when it allowed evidence of the UM policy limits before the jury. In addition, State Farm Mutual indicated:

> A new trial is the [sic] also the appropriate relief available to Plaintiff as a result of State Farm's belated disclosure of the [PLUP]. A new trial would not be necessary due to the belated disclosure of the [PLUP] if the underlying [UM] policy and its limit of $250,000 had not been admitted into evidence before the jury. Because of the admission of that evidence, however, it is possible that the jury capped its award at the policy limit. Because it is possible that Plaintiff was prejudiced as a result of the belated disclosure of the [PLUP], a new trial is warranted. Plaintiff's request, however, that the court increase the jury's award to a total sum of $2,250,000 (the combined limits of the policies) is clearly inappropriate under Indiana law because the evidence before the jury supported a range of verdicts.

(*Id.* at 106-7.) State Farm Mutual opposed Earl's request for attorney's fees and litigation expenses.

[8] In its Statement of Facts in its motion in opposition of Earl's motion to correct error, State Farm Mutual conceded

> that during its handling of the claim prior to the initiation of the present litigation it would have been appropriate for it to have confirmed with Plaintiff or her counsel the existence of the [PLUP] and the uninsured motorist coverage available under that policy. State Farm also readily concedes that its response to

Plaintiff's request for production and its answers to Plaintiff's interrogatories prepared by its counsel and, in the instance of the answers to interrogatories, signed by claim representative Sarah Smith [Vinnedge], were incomplete and should have referenced the [PLUP], even though State Farm never evaluated the claim as having a value remotely approaching the limit of the underlying policy.

(*Id*. at 107-8.)[3]

On March 23, 2013, Earl moved to withdraw her motion to correct error stating:

> There are good grounds for Plaintiff's motion, but upon further review, Plaintiff feels the appropriate action to take in these unusual circumstances is to pursue other remedies against State Farm Mutual Automobile Insurance Company so that further discovery may be conducted and so that she may be more fully compensated for State Farm's conduct.

(*Id*. at 126.) The trial court granted Earl's request to withdraw the motion to correct error.

State Farm Mutual subsequently appealed the trial court's decision to allow evidence of the UM policy limits before the jury. Our Indiana Supreme Court affirmed the trial court, holding "[a]lthough the probative value of the Earls' $250,000 coverage limit with State Farm is admittedly low, we cannot say the

---

[3] In their appellate brief, Defendants characterize this non-disclosure as "alleged." (Br. of Appellee at 8.) As the record indicates in multiple places that Defendants admitted they did not disclose the existence of the PLUP to Earl, we consider this a mischaracterization of the record, and we admonish counsel to avoid such mischaracterizations in the future.

trial court abused its discretion in finding that probative value was not outweighed by substantial prejudice." *State Farm Mut. Auto. Ins. Co. v. Earl*, 33 N.E.3d 337, 344 (Ind. 2015). The Court stated in a footnote:

> Unbeknownst to the Earls until after the jury trial, they were also covered by a separate [PLUP] that carried an endorsement for uninsured motorist coverage with a limit of $2 million. Kimberly moved to correct error, requesting the verdict be increased and she be awarded attorneys' fees and expenses because "if the jury had known about the [PLUP], it may have rendered a larger verdict." But before the trial court could rule on her motion, Kimberly withdrew it, saying she felt "the appropriate action to take in these unusual circumstances is to pursue other remedies" against State Farm. We need not address the [PLUP], however, as our analysis is limited to the narrow question presented before us: whether the trial court abused its discretion in admitting the $250,000 coverage limit.

*Id.* at 339 n.2 (internal citations to the record omitted).

[11] On November 26, 2014, Earl filed a complaint against Defendants alleging fraud, constructive fraud, bad faith, and breach of contract ("Fraud Litigation"). Earl requested

> damages for Kimberly S. Earl's emotional distress, attorney fees, and for punitive damages against State Farm Mutual Automobile Insurance Company, State Farm Fire & Casualty Company and Sarah Smith Vinnedge to punish and make example of their conduct, for the costs of suit incurred herein and for such other relief as the Court may deem just and proper.

(App. Vol. II at 62.)

[12]    On December 20, 2016, Defendants filed a motion for summary judgment, arguing Earl's claims were an "impermissible collateral attack on the judgment entered in the earlier lawsuit." (*Id*. at 26) (original formatting omitted). Additionally, Defendants asserted Earl "could not reasonably rely on representations of the coverages included in the PLUP," (*id*. at 32) (original formatting omitted), and thus summary judgment was proper on the fraud and constructive fraud counts. Finally, Defendants incorporated their earlier contentions with assertions of waiver to support their motion for summary judgment on the bad faith and breach of contract claims.

[13]    The trial court held a hearing on summary judgment on February 15, 2017. On February 17, 2017, the trial court granted summary judgment in favor of Defendants, finding all claims were impermissible attacks on the UM Litigation; Earl's fraud and constructive fraud claims were unsuccessful because, as a matter of law, Earl could not reasonably rely on Defendants' representations; Earl's bad faith claim was unsuccessful because, as a matter of law, Earl could not reasonably rely on Defendants' representations and "the undisputed facts establish that no other conduct of the Defendants constituted conscious wrongdoing," (*id*. at 14); and Earl's breach of contract claim was waived during the course of discovery.

# Discussion and Decision

# 1. Summary Judgment Standard of Review

We review summary judgment *de novo*, applying the same standard as the trial court. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). Drawing all reasonable inferences in favor of the non-moving party, we will find summary judgment appropriate if the designated evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id*. A fact is material if its resolution would affect the outcome of the case, and an issue is genuine if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences. *Id*.

The initial burden is on the summary judgment movant to demonstrate there is no genuine issue of fact as to a determinative issue, at which point the burden shifts to the non-movant to come forward with evidence showing there is an issue for the trier of fact. *Id*. While the non-moving party has the burden on appeal of persuading us summary judgment was erroneous, we carefully assess the trial court's decision to ensure the non-movant was not improperly denied his day in court. *Id.* Summary judgment is not a summary trial, and it is not appropriate just because the non-movant appears unlikely to prevail at trial. *Id*. at 1003-04. We "consciously err[ ] on the side of letting marginal cases proceed to trial on the merits, rather than risk short-circuiting meritorious claims." *Id*. at 1004.

## 2. Impermissible Collateral Attack on Prior Judgment

[16] The trial court granted summary judgment in favor of Defendants based in part on its conclusion that Earl's claims of fraud, constructive fraud, and bad faith were impermissible collateral attacks on the judgment in the UM Litigation. A collateral attack is "a judicial proceeding pursued to avoid, defeat, evade or deny the validity and effect of a valid judgment or decree." *In re Chapman*, 466 N.E.2d 777, 780 (Ind. Ct. App. 1984), *reh'g denied*, *trans. denied*. Earl argues the trial court erred when it granted summary judgment in favor of Defendants on that ground because the Fraud Litigation is not a collateral attack[4] on the judgment from the UM Litigation.

[17] Earl's complaint in the UM Litigation was based on Jerry's accident and State Farm Mutual's payment for the injuries he incurred, as well as for Kimberly's "loss of services, society and companionship of her husband." (App. Vol. II at

---

[4] The parties disagree regarding the analysis we are to undertake in this case, specifically regarding whether the issues in the Fraud Litigation are precluded by the proceedings in the UM Litigation. Earl's arguments are based on the doctrine of *res judicata*, and Defendants base their arguments on the rule against collateral attacks. Indiana cases use those two concepts interchangeably. *See, e.g., $100 v. State*, 822 N.E.2d 1001, 1007 n.7 (Ind. Ct. App. 2005) (noting if Ellenstein were to argue, as part of her forfeiture action, that her guilty plea was invalid, such argument would be barred as a collateral attack on her conviction), *trans. denied*. There does not seem to be, nor do the parties cite, any Indiana precedent that compares and contrasts "collateral attack" with the principles *of res judicata*. In fact, there are many cases that intermingle the use of the term "collateral attack" with the principles of *res judicata*. *See, e.g., Indiana Dep't of Envtl. Mgmt. v. Conrad*, 614 N.E.2d 916, 922-3 (Ind. 1993) (categorizing collateral attack and res judicata separately, but discussing collateral estoppel, or issue preclusion, as part of the collateral attack analysis); *and see Higgason v. Stogsdill*, 818 N.E.2d 486, 491-2 (Ind. Ct. App. 2004) (discussing issue preclusion as a "collateral attack" on a federal court ruling), *trans. denied*.

Defendants would like us to treat collateral attack as "a separate doctrine with separate elements." (Br. of Appellee at 28.) Defendants do not cite an Indiana case for this premise. Thus, we will follow the well-established precedent and address both interchangeably, as to foreclose future confusion in this case.

3.)  In Earl's prayer for damages as part of the UM Litigation, Earl requested "a judgment against the Defendant that will fully and fairly compensate them for their injuries and damages, cost of this action, pre-judgment interest and for all other relief necessary and proper in the premises."  (*Id*.)  As noted in the facts, the jury returned a judgment in favor of the Earl Estate and Kimberly for $175,000, and $75,000 respectively, and the trial court entered an order accordingly.

[18]  Earl's complaint in the Fraud Litigation alleged State Farm Mutual, State Farm Fire, and Vinnedge were liable to Earl for damages stemming from fraud, constructive fraud, and bad faith.  For these torts, Earl requested damages

> incurred by Plaintiff due to [Defendants'] fraud, including damages for Kimberly S. Earl's emotional distress, attorney fees, and for punitive damages against [Defendants] to punish and make example of their conduct, for the costs of suit incurred herein and for such other relief as the Court may deem just and proper.

(*Id*. at 62 (fraud)).  (*See also id*. at 63-4 (constructive fraud)); *and see id*. at 65 (bad faith)).

[19]  The UM Litigation was a contract action against State Farm Mutual.  *See Clevenger v. Progressive Northwestern Ins. Co.*, 838 N.E.2d 1111, 1114 (Ind. Ct. App. 2005) (interpretation of insurance policy is governed by the same rules of construction as other contracts).  As our Indiana Supreme Court stated in its review of State Farm Mutual's appeal of the UM Litigation decision:

Suits to recover pursuant to uninsured or underinsured motorist provisions have been recognized as involving issues of both contract law and tort law. *Malott v. State Farm Mut. Auto. Ins. Co.*, 798 N.E.2d 924, 926 (Ind. Ct. App. 2003). The underlying cause of action is based on the contractual relationship between the insured and the insurer, although the parties may principally litigate the measure of damages relying upon tort principles. *Id.*; *Brown-Day* [*v. Allstate Ins. Co.*], 915 N.E.2d [548,] 552 [(Ind. Ct. App. 2009)] ("The cause of action to be tried before the jury is a first party claim for contract enforcement against [insurer], seeking underinsured motorist benefits."); *Allstate Ins. Co. v. Hammond*, 759 N.E.2d 1162, 1166 (Ind. Ct. App. 2001) (finding even though the trial focused entirely on the nature and extent of the plaintiff's damages, the "action was effectively one alleging breach of contract by [insurer] in failing to pay uninsured motorist benefits").

Here, the Earls presented an underlying breach of contract claim in their complaint, alleging, "in consideration of the premiums stated therein, [State Farm] issued an insurance policy" that "was in full force and effect on [the day of the accident]," and State Farm was "liable under the terms and conditions of the contract for insurance." App. at 21-22. And the case was tried as such. In his opening statement, the Earls' lawyer described the suit as "a dispute over a contract between the Earls and State Farm." Tr. at 81.

*Earl*, 33 N.E.3d at 341.

[20] By contrast, the Fraud Litigation is a claim against State Farm Mutual and two other related defendants, State Farm Fire and Vinnedge, for the common law torts of fraud, constructive fraud, and bad faith. The elements of common-law fraud are:

(1) a material misrepresentation of past or existing fact which (2) was untrue, (3) was made with knowledge of or in reckless ignorance of its falsity, (4) was made with the intent to deceive, (5) was rightfully relied upon by the complaining party, and (6) which proximately caused the injury or damage complained of.

*Lawyers Title Ins. Corp. v. Pokraka*, 595 N.E.2d 244, 249 (Ind. 1992), *reh'g denied*.

The elements of common-law constructive fraud are:

i) a duty owing by the party to be charged to the complaining party due to their relationship; (ii) violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists; (iii) reliance thereon by the complaining party; (iv) injury to the complaining party as a proximate result thereof; and (v) the gaining of an advantage by the party to be charged at the expense of the complaining party.

*Rice v. Strunk*, 670 N.E.2d 1280, 1284 (Ind. 1996). Regarding actions involving insurance companies, the obligation of good faith and fair dealing includes the agreement to refrain from: "(1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of his claim." *Erie Ins. Co. v. Hickman by Smith*, 622 N.E.2d 515, 519 (Ind. 1993). Additionally, proving bad faith amounts to showing more than bad judgment or negligence: "it implies the conscious doing of wrong because of dishonest purpose or moral obliquity. . . . [I]t contemplates a state of mind affirmatively operating with furtive design or ill will." *Oxendine v. Public Serv. Co.*, 423 N.E.2d 612, 620 (Ind. Ct. App. 1980).

While the Fraud Litigation requires consideration of facts relevant to both cases, specifically Defendants' behavior during the UM Litigation prompted by Jerry's accident, there is no overlap in claims or of requested damages between these two actions. Further, Earl's complaint in the Fraud Litigation does not ask the trial court to avoid, defeat, evade or deny the validity and effect of the judgment in the UM Litigation. Thus, the Fraud Litigation was not an impermissible collateral attack on the UM Litigation. *See In re Chapman*, 466 N.E.2d at 780 (a collateral attack is "a judicial proceeding pursued to avoid, defeat, evade or deny the validity and effect of a valid judgment or decree").[5]

### 3. Reliance on Defendants' Representations

As noted *supra*, common-law fraud requires

> (1) a material misrepresentation of past or existing fact which (2) was untrue, (3) was made with knowledge of or in reckless ignorance of its falsity, (4) was made with the intent to deceive, (5) was rightfully relied upon by the complaining party, and (6) which proximately caused the injury or damage complained of.

---

[5] Further, claim preclusion and issue preclusion under the doctrine of *res judicata* do not apply. *Res judicata* serves to prevent repetitious litigation of disputes that are essentially the same. *Dawson v. Estate of Ott*, 796 N.E.2d 1190, 1195 (Ind. Ct. App. 2003). Claim preclusion applies when a final judgment on the merits has been rendered and acts to bar a subsequent action on the same claim between the same parties. *Id*. Issue preclusion, also called collateral estoppel, "bars the subsequent litigation of a fact or issue that was necessarily adjudicated in a former lawsuit if the same fact or issue is presented in the subsequent lawsuit." *Afolabi v. Atlantic Mort. & Inv. Corp.*, 849 N.E.2d 1170, 1175 (Ind. Ct. App. 2006). As noted in our discussion *supra*, the claims, issues, and material facts in the UM Litigation and the Fraud Litigation are not the same.

*Pokraka*, 595 N.E.2d at 249. Here, the issue is whether Earl "rightfully relied upon" the information Defendants provided regarding the Earls' insurance coverage.

When considering the reasonableness of a party's reliance, we consider the fact of reliance and the right of reliance. *Roberts v. Agricredit Acceptance Corp.*, 764 N.E.2d 776, 777 (Ind. Ct. App. 2002). Regarding the fact of reliance, we have held

> [w]hen both parties are dealing at arm's length and one party, in spite of the facts well known to him, deliberately ignores such facts and chooses to believe statements to the contrary, he closes his eyes to the truth and deliberately takes a chance. It then cannot be said that he was injured in law. All that can be said is that he gambled and lost.

*Plymale v. Upright*, 419 N.E.2d 756, 761 (Ind. Ct. App. 1981). The right of reliance

> is more difficult to determine for the reason it is tightly bound up with the duty of a representee to be diligent in safeguarding his interests. The legal obligation that a person exercise the common sense and judgment of which he is possessed is a practical limitation on the actionability of various representations. In the course of daily interaction and business dealing the average person encounters a barrage of opinions, advice, advertisements, estimates, and even "guestimates." He simply cannot believe, or rely upon, everything he is told. . . . However, it is also settled that where persons stand mentally on equal footing, and in no fiduciary relation, the law will not protect one who fails to exercise common sense and judgment.

*Id*. at 762.

[24] Earl argues she "had every right to rely on State Farm's fraudulent misrepresentation of complex insurance coverage." (Br. of Appellant at 34) (original formatting omitted). Additionally, she argues summary judgment was improper because the issue of reliance is a question for the jury. We agree.

[25] In *Plohg v. NN Investors Life Ins. Co. Inc.*, 583 N.E.2d 1233 (Ind. Ct. App. 1992), *trans. denied*, our court stated, regarding reasonable reliance upon the representation of an insurance agent even when the insured has a copy of the policy:

> The remaining question is whether in the exercise of reasonable care they were entitled to rely upon them. The traditional rule has been that reliance is not justified where the injured party has a written instrument available and fails or neglects to read it. On the other hand, we have come to recognize that in the modern world ordinary, *i.e.* reasonable, care does not necessarily require a person to read something as complex as today's insurance policies. Rather, whether a party's reliance upon an agent's representations is reasonable even though he failed to exercise the opportunity to read the policy is a question of fact for the factfinder.

*Plohg*, 583 N.E.2d at 1237 (internal citations omitted).

[26] The holding in *Plohg* relied heavily on the decision in *Medtech Corp. v. Indiana Ins. Co.*, 555 N.E.2d 844 (Ind. Ct. App. 1990), *trans. denied*, in which our court noted, "[g]iven the complexity of today's insurance contracts we cannot say as a matter of law, that such reliance [on the statements of the agent] was unjustified." *Id.* at 850. In a footnote, the court quoted a portion of the concurrence in the denial of transfer in an earlier related opinion:

An insurance contract is a detailed and complex instrument, drafted by expert legal counsel, standardized and presented in mass-produced form and delivered to the applicant for acceptance, normally without benefit of legal counsel on his part. It has been called a 'contract of adhesion' for the reason that the insured is expected to 'adhere' to it as it is, with little or no choice as to its terms. The Delivery of a Life Insurance Policy, 33 Harvard Law Review, 198.

Coupled with this situation is the recognized fact that rarely, if ever, does an insured read his insurance contract, although the law has said, with reference to contracts generally, that a party is bound by what the instrument says though ignorant of its terms. In fact, realistically, even if the insured had the inclination to attempt to read the policy, I doubt that he would gain much more knowledge than he previously had because of the technical language he would encounter. I doubt that most lawyers or even judges who say one is presumed to have read his insurance policy ever read them.

*Vernon Fire & Casualty Ins. Co. v. Thatcher*, 152 Ind. App. 692, 285 N.E.2d 660 (1972), *reh'g denied*, *trans. denied*.

[27]  Defendants argue *Plohg* and *Medtech* are inapposite because "this case does not involve the interpretation of complex insurance provisions[.]" (Br. of Appellee at 51.) Further, Defendants argue Earl had sufficient notice of the terms of the PLUP policy and how it might apply to Jerry's accident because this information was reflected on many pages of the policy documents including the declarations page, which is found on the first page of the policy. (*See id*. at 52-3) (giving examples of the many ways Defendants argue Earl had notice of the policy terms through the policy documents). To support their argument,

Defendants rely on *Wiggam v. Assoc. Fin. Serv. of Indiana, Inc.*, 677 N.E.2d 87 (Ind. Ct. App. 1997), *trans. denied*.

[28]  *Wiggam* involved disability insurance available for a loan, which would make payments on the loan if Wiggam were disabled and unable to pay. Wiggam elected to receive this insurance on a loan he took out in 1986, but did not do so with the loan he took out in 1988, although he thought he did. Wiggam was permanently disabled in 1992, and sought to apply the benefit from his disability insurance policy for the loans in 1986 and 1988. Associates denied his claim for the 1988 loan because Wiggam had not signed the portion of the loan application indicating he wanted disability insurance for the 1988 loan.

[29]  Wiggam sued Associates, claiming the Associates agent who helped him with the 1988 loan told him he would have disability insurance as part of the 1988 loan. Associates filed for summary judgment, arguing the loan application plainly indicated Wiggam had not signed the area that stated he wanted the disability insurance. In interpreting *Medtech*, the court held:

> Appellants contend that the holding in *Medtech* is not applicable here because this case does not involve the terms of a complex insurance contract. Rather, it is argued, this court is faced, as were the Wiggams, with what is described as a short, simple and unambiguous loan application form. We agree with the Wiggams that when an insurance agent makes oral representations about the content or effect of a complex insurance policy which actually contradict the express terms of the policy, an insured's reasonable reliance upon those representations may override the insured's obligation to read and be familiar with the terms of the policy. However, an

examination of the reasoning set forth in *Medtech* persuades us that the holding in that case should not be extended to the present situation.

> The Court of Appeals in *Medtech* explained that its holding was justified by the nature and complexity of insurance contracts. . . . [T]he exception described in *Medtech* simply has no application here. This case does not involve the terms of a complex insurance policy. Rather, it involves a few clear terms in a two-page application for insurance. Nor is this a contract of adhesion under which one must accept the terms of a pre-printed insurance policy as they are written or decline coverage altogether. It is clear from the face of the loan application that, while the Wiggams may not have had any meaningful choice as to the terms of the Credit Life or Credit Disability policies, they were free to choose whether or not their loan would be covered by either of these policies.

*Id*. at 90-1. Defendants argue the same simplicity exists in the documents of the PLUP.

[30] We cannot agree, as the language in the PLUP is more complex than the two-page loan document in *Wiggam*. As we explain in our analysis of Earl's bad faith argument *infra*., even within State Farm there existed confusion regarding the coverage available. We therefore decline to follow *Wiggam* and conclude there is a question of fact regarding whether Earl's reliance on Defendants' representations of her insurance coverage was reasonable. *See Plohg*, 583 N.E.2d at 1237 ("whether a party's reliance upon an agent's representations is reasonable even though he failed to exercise the opportunity to read the policy is a question of fact for the factfinder").

# 4. Bad Faith

Insurers are obligated to exercise good faith in determining the payment of an insured's claim. *Erie Ins. Co.*, 622 N.E.2d at 518-9.

> The obligation of good faith and fair dealing with respect to the discharge of the insurer's contractual obligation includes the obligation to refrain from (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of his claim.

*Id*. at 519. Earl argues summary judgment was improper because "State Farm's deceit and moral obliquity in hiding the PLUP present a prima facie case of bad faith for a jury." (Br. of Appellant at 39) (internal formatting omitted).

Earl outlines what she argues is a "deceptive fact pattern" in a table in her brief. (Br. of Appellant at 41.) For example, on October 16, 2008, State Farm first noted the possible applicability of the PLUP to Earl's claim. (App. Vol. IV at 142.) On October 24, 2009, State Farm's Claim Notes indicate State Farm did "not appear to have PLUP exposure," (*id*. at 128), based on Vinnedge's "range of value" of the claim. (*Id*.) The entry also stated, "we need to contact the atty [sic] and explain the coverages available, including the PLUP (make sure it carries Uninsured Motorist first). Given the atty's [sic] assessment of claim exceeding $250,000, let's get the PLUP open." (*Id*.) On October 27, 2009, State Farm opened a PLUP claim for Jerry's accident, but it closed the claim on June 7, 2010.

[33]   As noted in the facts, on February 18, 2011, Vinnedge answered the Earls' interrogatories regarding policy coverage and did not disclose the existence of the PLUP. On November 26, 2012, the jury trial in the UM Litigation began. On November 27, 2012, at 9:42 a.m., State Farm's Claim Notes indicate the jury started deliberations. At 10:02 a.m. that day, an entry indicates, "I saw where there is a PLUP that they may need to know this info. [sic] I called & spoke with several [State Farm] reps - finally spoke with Kent . . . He said Jerry Earl was rated on this [PLUP] for 1 mill [sic] under the 041." (*Id.* at 45.)

[34]   A subsequent entry confirmed the existence of the PLUP, and the fact it had a limit of $2 million. At 11:02 a.m. on November 27, 2012, the notes indicate the jury came back with its verdict. Between November 27, 2012, and November 30, 2012, there are ten entries regarding the disclosure of the PLUP, some of which are partially redacted in the record. Earl's counsel learned of the PLUP on December 3, 2012. There are multiple instances in State Farm's Claim Notes indicating the Earls had PLUP coverage for Jerry's accident.

[35]   At the very least, the above-described chain of events creates a question of material fact whether State Farm acted in bad faith. Thus, the trial court erred when it granted summary judgment in favor of Defendants on this issue.[6] *See*

---

[6] Defendants argue Earl has waived this argument because she

> did not designate as an error either the trial court's entry of summary judgment as to that part of the claim for bad faith based on conduct other than the non-disclosure of the PLUP or the entry of summary judgment for State Farm Fire on [the breach of contract claim]. Nor did she cite to any evidence in the record which she contends creates an issue of material fact regarding those claims.

*Hughley*, 15 N.E.3d at 1003 (summary judgment inappropriate if there exists an issue of material fact or if the undisputed facts support conflicting reasonably inferences).

# Conclusion

We conclude the trial court erred when it granted summary judgment in favor of Defendants. The claims in Earl's Fraud Litigation were not impermissible collateral attacks on the judgment in the UM Litigation. Further, the issue whether Earl unreasonably relied on Defendants' representations is a question of fact to be decided by the factfinder. Finally, Earl has demonstrated a genuine issue of material fact regarding whether Defendants acted in bad faith in handling her claim, and thus, summary judgment is inappropriate. Accordingly, we reverse the trial court's decision and remand for proceedings consistent with this opinion.

Reversed and remanded.

---

(Br. of Appellee at 21.) *See Anderson v. Four Seasons Equestrian Center, Inc.*, 852 N.E.2d 576, 581 n.7 (Ind. Ct. App. 2006) (arguments not presented before the trial court cannot be presented for the first time on appeal), *trans. denied*; *and see Cox v. Ubik*, 424 N.E.2d 127, 131 n.3 (Ind. Ct. App. 1981) (party waives any issue not raised and argued in its appellate brief). However, the same facts support Earl's fraud claims and Earl's bad faith claim. Thus Earl was not required to assert additional facts supporting the bad faith claim.

Additionally, Earl did not provide argument regarding her breach of contract claim that was part of the Fraud Litigation because she did not appeal that portion of the order, as conceded by both parties during oral argument. We again admonish Defendants' counsel from mischaracterizing the record and arguments before us.

Baker, J., and Najam, J., concur.