## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 13 2018, 9:06 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Mark C. Ladendorf
Timothy F. Devereux
Ladendorf Law
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Ginny L. Peterson
Kightlinger & Gray, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Rebecca Harris and Boyd Harris, *Appellants-Plaintiffs,* | December 13, 2018 |
| v. | Court of Appeals Case No. 18A-CT-964 |
| | Appeal from the Marion Superior Court |
| Safeco Insurance Company of Indiana, | The Honorable James A. Joven, Judge |
| *Appellee-Defendant.* | Trial Court Cause No. 49D13-1607-CT-26864 |

**Mathias, Judge.**

[1] Rebecca Harris ("Rebecca") and Boyd Harris ("Boyd") (collectively "the Harrises") appeal from the Marion Superior Court's grant of summary judgment in favor of Safeco Insurance Company of Indiana ("Safeco") in the

Harrises' complaint against Safeco seeking a declaratory judgment that they were entitled to insurance coverage under an umbrella policy issued by Safeco. On appeal, the Harrises claim that the trial court erred in granting summary judgment in favor of Safeco because there are genuine issues of material fact precluding summary judgment.

[2] We affirm.

## Facts and Procedural History

[3] The Harrises procured insurance coverage through agent Deborah Mock ("Mock") of the Walker Agency ("the Agency"), an independent insurance agency. On March 3, 2014, the Agency provided Rebecca a quotation from Safeco for auto and home insurance after Rebecca had requested an insurer other than Travelers Insurance Company ("Travelers"), the insurer then providing the Harrises coverage through the Agency. The following month, Rebecca asked Mock if she could get a quote on an umbrella insurance policy. Mock provided Rebecca with quotes from both Travelers and Safeco.

[4] Ultimately, the Harrises obtained via the Agency a watercraft policy ("the Watercraft Policy") issued by Safeco. The Watercraft Policy had an effective date of October 29, 2014 to October 29, 2015, and contained uninsured/ underinsured watercraft coverage. The Watercraft Policy had a limit of $500,000 for bodily injury for uninsured/underinsured watercraft.

[5] The Harrises also obtained via the Agency an umbrella policy ("the Umbrella Policy"), which is at issue in the present case. The Harrises claim that they

asked Mock to provide uninsured/underinsured watercraft coverage under the Umbrella Policy. However, the language of the Umbrella Policy provides coverage for uninsured/underinsured land vehicles, but not for uninsured/underinsured watercraft. The Umbrella Policy has a limit of $1,000,000.

[6] On May 17, 2015, the Harrises were using one of their covered watercraft on Geist Reservoir in Marion County. Rebecca was injured when the Harrises' boat was struck by a boat operated by Lam Nguyen ("Nguyen").

[7] Nguyen admitted liability for the Accident, and his insurer paid the Harrises the policy limits of $300,000. Believing that Nguyen's policy did not adequately cover their damages, the Harrises made a claim under the underinsured watercraft provision of their own Watercraft Policy. Safeco paid the Watercraft Policy's $500,000 limit to the Harrises. Still believing that their injuries were not adequately redressed, the Harrises also asserted a claim of coverage under their Umbrella Policy. Although Mock initially indicated that the Umbrella Policy would provide coverage, Safeco denied coverage.

[8] The Harrises filed a complaint for declaratory action and damages on July 28, 2016, seeking a declaratory judgment that the boating accident fell within the coverage provided by the Umbrella Policy. Safeco filed its answer on September 23, 2016. On December 27, 2016, Safeco filed a motion for summary judgment, arguing that the Harrises were not entitled to coverage under the language of the Umbrella Policy. The trial court granted the Harrises an extension of time

in which to respond to Safeco's motion, which they did on January 31, 2017. The trial court held a hearing on the motion for summary judgment on March 14, 2018, at the conclusion of which the court took the matter under advisement. The trial court issued an order on April 3, 2018, granting Safeco's motion for summary judgment. The Harrises now appeal.

## Summary Judgment Standard of Review

[9] The standard we apply upon review of a trial court's order granting a motion for summary judgment is well settled:

> A trial court should grant a motion for summary judgment only when the evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The trial court's grant of a motion for summary judgment comes to us cloaked with a presumption of validity. An appellate court reviewing a trial court summary judgment ruling likewise construes all facts and reasonable inferences in favor of the non-moving party and determines whether the moving party has shown from the designated evidentiary matter that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. But a de novo standard of review applies where the dispute is one of law rather than fact. We examine only those materials designated to the trial court on the motion for summary judgment. . . . We must affirm the trial court's entry of summary judgment if it can be sustained on any theory or basis in the record.

*Altevogt v. Brand*, 963 N.E.2d 1146, 1150 (Ind. Ct. App. 2012) (citations and internal quotations omitted).

# Discussion and Decision

The Harrises' argument is twofold: they argue that the language of the Umbrella Policy is ambiguous as to whether it provides coverage for the boating accident and that this alleged ambiguity must be resolved in their favor. They also argue that Mock was an agent of Safeco with authority to bind Safeco and that Mock's representations estop Safeco from denying coverage. We address these arguments in turn.

## I. The Umbrella Policy is Unambiguous

The Harrises argue that the language of the Umbrella Policy is ambiguous and should be interpreted in their favor. We have explained before that:

> [i]t is well-established that the interpretation of an insurance policy is primarily a question of law for the court. Therefore, the interpretation of an insurance contract is . . . particularly well-suited for disposition by summary judgment.
>
> We review an insurance policy using the same rules of interpretation applied to other contracts, namely if the language is clear and unambiguous we will apply the plain and ordinary meaning. An insurance policy is ambiguous where a provision is susceptible to more than one interpretation and reasonable persons would differ as to its meaning. An ambiguity, however, does not exist merely because the parties favor different interpretations.
>
> The meaning of an insurance contract can only be gleaned from a consideration of all its provisions, not from an analysis of individual words or phrases. We must accept an interpretation of the contract language that harmonizes the provisions rather than the one which supports a conflicting version of the provisions. However, the power to interpret insurance contracts does not

extend to changing their terms, and we will not give insurance policies an unreasonable construction to provide added coverage.

*Adkins v. Vigilant Ins. Co.*, 927 N.E.2d 385, 389 (Ind. Ct. App. 2010) (citations omitted), *trans. denied*.

[12] In the present case, the Umbrella Policy provides in relevant part:

## COVERAGES

### PERSONAL LIABILITY

We will pay the **ultimate net loss**[1] in excess of the **retained limit**[2] that the **insured**[3] is legally responsible for because of covered **bodily injury**,[4] **personal injury**[5] or **property damage**[6] caused by an occurrence.

\* \* \*

---

[1] The Umbrella Policy defines the term "ultimate net loss" as "the amount paid or payable in settlement of the loss for which any **insured** is held liable by: (1) court judgment; or (2) compromise involving our written consent. All recoveries and salvage collected will be deducted from this amount." Appellants' App. Vol. 2., p. 54 (bold in original). The Umbrella Policy also provides that "ultimate net loss" does not include "(1) loss expense or legal expenses (such as attorney's fees and court costs); (2) salaries of employees; or (3) office expenses incurred by any **insured**, us, or any underlying carrier." *Id.* (bold in original).

[2] The Umbrella Policy defines the "retained limit" as "a. the limit of liability specified in the Schedule of Underlying Insurance of the Declarations for each underlying policy, plus the limit of any other underlying insurance collectible by the insured; or b. the amount shown under **retained limit** in the Declarations, as the result of an **occurrence** not covered by underlying policies of insurance." *Id.* at 53 (bold in original).

[3] Both Harrises are named insureds under the Umbrella Policy.

[4] "'**Bodily injury**' means bodily harm, sickness or disease including resulting required care, loss of services and death." *Id.* at 52 (bold in original).

[5] "'**Personal injury**' means injury arising out of one or more of the following offenses: a. false arrest, detention or imprisonment, or malicious prosecution; b. libel, slander or defamation of character; or c. invasion of privacy, wrongful eviction or wrongful entry." *Id.* at 53 (bold in original).

[6] "'**Property damage**' means physical injury or destruction of tangible property including loss of its use." *Id.*

## EXCLUSIONS

This policy does not apply to any:

\* \* \*

4. *bodily injury* or *personal injury* to you or any family member.

5. **bodily injury**, **personal injury** or **property damage**:

   a. arising out of the ownership, maintenance, use, operation, loading or unloading of:

   \* \* \*

   (3) any watercraft while away from premises owned by any **insured** if the watercraft is:

   (a) powered by an inboard or inboard-outboard motor;

   (b) a sailing vessel (with or without auxiliary power) of 26 feet or more in overall length;

   (c) powered by one or more outboard motors with more than 25 total horsepower; or

   (d) a **personal watercraft**.[7]

   (e) Unless, with respect to 5.a.(3)(a) through 5.a.(3)(d), above, the watercraft is covered by **underlying insurance** and:

   i. coverage is stated and a premium is charged on the Declarations of this policy; or

---

[7] "'**Personal watercraft**' means jet skis, wet bikes or other craft using a water jet pump powered by an internal combustion engine as the primary source of propulsion." *Id.*

> ii. notice is given to us within forty-five days after acquisition of any newly acquired watercraft and an additional premium is charged.
>
> (f) We will, however, cover any **insured** while operating a borrowed or rented watercraft regardless of size or horsepower with the express or implied permission of the owner or other person having lawful possession. The actual use must be within the scope of that permission.

Appellants' App. Vol. 2, pp. 54–56 (italic emphasis added, bold in original).

[13] The Harrises argue that an exception to exclusion 5 creates an ambiguity as to whether coverage exists under the Umbrella Policy for Rebecca's personal injuries. Specifically, they note that subparagraph 5.a.(3) provides that the policy excludes "bodily injury, personal injury or property damage . . . arising out of the ownership, maintenance, use, operation, loading or unloading of . . . a personal watercraft" *unless* the watercraft is "covered by underlying insurance" and such "coverage is stated and a premium is charged on the Declarations of this policy" or "notice is given to [Safeco] within forty-five days after acquisition of any newly acquired watercraft and an additional premium is charged." *Id*. at 55–56. The Harrises note that their watercraft was covered by an underlying Watercraft Policy for which they paid a separate premium. Therefore, the Harrises argue that the Umbrella Policy appears to provide coverage under this exception to exclusion 5.

[14] The problem with the Harrises' argument is that it ignores the explicit and unambiguous language of exclusion 4, which clearly states that the policy does

not apply to "*bodily injury* or personal injury to you or any family member." *Id.* at 55 (emphasis added). As Rebecca is a named insured, this provision undoubtedly applies to her and her claims of bodily injury. The exception to exclusion 5 is therefore inapplicable and cannot act to create coverage.

[15] As noted by Safeco, an exception to an exclusion acts to narrow the scope of the exclusion, but it does not itself create coverage. *Sheehan Const. Co. v. Cont'l Cas. Co.*, 935 N.E.2d 160, 162 (Ind. 2010), *adhered to on reh'g*, 938 N.E.2d 685 (citing David Dekker, Douglas Green & Stephen Palley, *The Expansion of Insurance Coverage for Defective Construction*, 28 Constr. Law pp. 19–20 (Fall 2008)); *see also Indiana Ins. Co. v. DeZutti*, 408 N.E.2d 1275, 1278 (Ind. 1980) (noting the "basic principle" that exclusion clauses do not grant or enlarge coverage but instead are limitations or restrictions on the insuring clause). Accordingly, the exception to exclusion 5 contained in subparagraph 5.a.(3) cannot create coverage where exclusion 4 plainly and unambiguously excludes coverage.[8]

[16] Furthermore, to the extent that the Harrises argue that the Umbrella Policy provided coverage under the uninsured/underinsured motorist portion of the policy, the language of the policy clearly excludes coverage. The

---

[8] Our conclusion does not render the exceptions contained in subparagraph 5.a.(3) superfluous, as this would still allow coverage for claims made against the Harrises by a third party resulting from the Harrises' operation of a watercraft.

uninsured/underinsured clause of the Umbrella Policy provides in relevant part:

> UNINSURED/UNDERINSURED MOTORISTS COVERAGE
>
> We will pay to you or your legal representative, all sums less the **retained limit** that you are entitled to recover as damages from an uninsured motor **vehicle**; provided that:
>
> 1. Our liability shall be only excess of the **retained limit**;
>
> 2. Uninsured/Underinsured Motorists Coverage under this policy shall apply In accordance with the terms and conditions of the underlying Insurance in effect at the time of loss, or in the absence of such underlying Insurance, with the terms and conditions of Uninsured/Underinsured Motorists Coverage in effect on the last renewal date of this policy.

Appellants' App. Vol. 2, p. 54 (bold in original). The Umbrella Policy defines the word "vehicle" to mean

> a. a private passenger *land* motor vehicle, trailer or semi-trailer:
>
>   (1) designed for use principally on public roads;
>
>   (2) while being used on public roads, if subject to the motor vehicle registration law or financial responsibility law of the state of principal garaging; or
>
>   (3) that is designed for recreational use off public roads;
>
> b. farm tractors; or
>
> c. trailers and implements while being towed by a vehicle identified in 19.a or 19.b.

*Id.* (emphasis added). Simply put, the uninsured/underinsured provision of the Umbrella Policy applies only to "vehicles" as defined in the policy, and "vehicle" as defined in the policy means only land-based vehicles. Thus, the clear and unambiguous language of the Umbrella Policy excludes uninsured/underinsured coverage for boats.

[17] Furthermore, Exclusion 8 of the Umbrella Policy clearly excludes coverage for "amounts payable under any Uninsured/Underinsured Watercraft Bodily Injury coverage." *Id*. at 58. Here, it is undisputed that the Harrises have already received the $500,000 policy limit under their watercraft policy. Thus, this exclusion to the Umbrella Policy clearly excludes coverage for Rebecca's claims.

[18] In short, the clear and unambiguous language of the Umbrella Policy excludes coverage for the Harrises' claims. The trial court therefore properly granted summary judgment on the Harrises' claim that the language of the Umbrella Policy is ambiguous and should be construed to provide coverage for their claims.

## II. Safeco Is Not Estopped From Denying Coverage

[19] The Harrises also argue that, regardless of the language of the policy, Mock was acting as an agent for Safeco with both actual and apparent authority to bind Safeco to coverage under the Umbrella Policy. The Harrises argue that Mock's assurances that they would be covered under the Umbrella Policy acts to estop Safeco from denying coverage.

[20]     With regard to Mock's role as an agent, our supreme court has explained:

> The term "insurance agent" is often used loosely. But because the term invokes agency principles, we must identify the principal for whom the insurance intermediary is an agent. A party who negotiates an insurance contract to cover someone else's risk is acting as an agent for either the insured or the insurer. Depending on whose interests the "insurance agent" is representing, he or she may be a "broker" or an "agent." A critical distinction exists. A representative of the insured is known as an "insurance broker." *As a general rule, a broker is the agent of the insured, and not the insurer.* As such the insurer is not liable for the broker's tortious conduct. A broker represents the insured by acting as an intermediary between the insured and the insurer, soliciting insurance from the public under no employment from any special company, and, upon securing an order, places it with a company selected by the insured, or if the insured has no preference, with a company selected by the broker. In contrast, an "insurance agent" represents an insurer under an employment agreement by the insurance company. *Unlike acts of a broker, acts of an [insurance] agent are imputable to the insurer.* Whether an insurance intermediary is an agent of the insured or the insurer is fact sensitive and includes consideration of the facts and circumstances of the case, the relation of the parties, their actions, their usual course of dealing, any instructions given to the person by the company, the conduct of the parties generally, and the nature of the transaction.

*Estate of Mintz v. Connecticut Gen. Life Ins. Co.*, 905 N.E.2d 994, 1000–01 (Ind. 2009) (emphases added) (citations and internal quotation marks omitted).

[21]     Further, as this court has held, an insurance agent representing several companies is considered to be an insurance broker. *Malone v. Basey*, 770 N.E.2d 846, 851 (Ind. Ct. App. 2002), *trans. denied*. An insurance agent or broker who

undertakes to procure insurance for another is an agent of the proposed insured. *Id.* However, an insurance broker becomes the agent of the insurer when an insurance policy is issued. *Id.* When a broker makes an application for insurance and the insurance policy is issued, the broker is the agent of the insurer and can bind it within the scope of his authority. *Id.* (citing *Aetna Ins. Co. of the Midwest v. Rodriguez*, 517 N.E.2d 386, 388 (Ind. 1988)).

[22]    Here, the Harrises argue that Mock was acting as the agent of Safeco and acted with apparent authority to bind Safeco to coverage. Assuming *arguendo* that Mock was acting as Safeco's agent, we conclude that Mock's statements regarding coverage were not sufficient to estop Safeco from denying coverage.

[23]    In the context of insurance, estoppel refers to a preclusion from asserting rights by an insurance company or an abatement of rights and privileges of the insurance company where it would be inequitable to permit the assertion. *Founders Ins. Co. v. Olivares*, 894 N.E.2d 586, 592 (Ind. Ct. App. 2008). Indiana courts follow the general rule that the doctrine of estoppel is not available to create or extend the scope of coverage of an insurance contract. *Id.* The rationale for this rule is that an insurance company should not be forced to pay for a loss for which it had not charged a premium. *Id.* We have, however, recognized exceptions to this general rule. *Id.* One exception exists when an insurer misrepresents the extent of coverage to an insured, thereby inducing the

insured to purchase coverage which does not in fact cover the disputed risk.[9] *Employers Ins. of Wausau v. Recticel Foam Corp.*, 716 N.E.2d 1015, 1028 (Ind. Ct. App. 1999), *trans. denied*. "This exception has been a vehicle 'to create insurance coverage where to refuse to do so would sanction fraud or other injustice.'" *Transcon. Ins. Co. v. J.L. Manta, Inc.*, 714 N.E.2d 1277, 1281 (Ind. Ct. App. 1999) (quoting *Nationwide Mut. Ins. Co. v. Filos*, 673 N.E.2d 1099, 1103 (Ill. App. Ct. 1996)). It is this exception that the Harrises argue applies in the present case.

[24] The Harrises claim that there is designated evidence showing that they requested uninsured/underinsured coverage for the watercraft in the Umbrella Policy and that Mock assured them that such coverage was provided by the Umbrella Policy. The Harrises therefore argue that Safeco should be estopped from denying them coverage under the Umbrella Policy. The designated evidence the Harrises refer to is Rebecca's affidavit and Mock's deposition testimony.

[25] In her affidavit, Rebecca averred that, on June 19, 2014, she asked Mock for a quote on a $1,000,000 umbrella policy that would apply to the Harrises' home, automobiles, and watercraft. Rebecca's affidavit continues:

> 9.    In response, on June 23, 2014 Deborah Mock provided me with a quote for an umbrella policy from Safeco Insurance Company with a policy limit of $1,000,000.00 which provided

---

[9] Under the other exception, an insurer may be estopped from raising the defense of noncoverage when it assumes the defense of an action on behalf of its insured without a reservation of rights but with knowledge of facts which would have permitted it to deny coverage. *Olivares*, 894 N.E.2d at 592.

coverage for uninsured/underinsured benefits and which specifically listed 2 powerboats under "OTHER AND OPTIONAL COVERAGES."

10.  On that same day Deborah Mock prepared a binder of coverage document for [the Umbrella Policy] which she signed as an "Authorized Representative" of Safeco Insurance.

11.  On that same day, June 23, 2014, my husband and I signed a Safeco Insurance document entitled "PERSONAL UMBRELLA UNINSURED/UNDERINSURED MOTORISTS COVERAGE SELECTION REQUEST (INDIANA)" in which we elected to purchase uninsured/underinsured coverage under [the] Umbrella Policy[.]

12.  *Based upon my contacts with Deborah Mock, it was my belief that the Safeco Insurance Umbrella Policy . . . provided the $1,000,000.00 in uninsured/underinsured coverage for our two (2) boats that I had specifically requested.*

13.  Shortly thereafter, I received a "Welcome to Safeco!" letter dated July 1, 2014 from Safeco Insurance in connection with the Umbrella Policy [] which was signed by Matthew D. Nickerson, the President of Safeco Insurance. Attached to that letter was a page titled "WHERE TO TURN FOR HELP" informing me that if I had any questions regarding my umbrella policy or coverage I should contact Deborah Mock and the Walker Insurance Agency, the agents listed on the Declarations Page of the umbrella policy.

14.  *I relied upon the information provided to me by Deborah Mock that the Safeco Umbrella Policy [] provided underinsured coverage for our watercraft.*

15.  I paid the premiums for the Safeco Umbrella Policy [] fully believing that that policy provided underinsured coverage for our two (2) boats which coverage I had specifically requested and which Deborah Mock indicated was included.

Appellants' App. Vol. 3, p. 43–44 (emphases added).

[26] Rebecca's affidavit further avers, and Mock's deposition testimony corroborates, that Mock told Rebecca after the accident that Mock was glad that the Harrises had purchased the Umbrella Policy and believed that the Umbrella Policy would provide coverage to Rebecca for her injuries. Based on this evidence, the Harrises claim that Mock misrepresented the extent of the coverage available under the Umbrella Policy.[10]

[27] The problem with the Harrises' argument is that Mock's statements that she thought the Harrises' claim would be covered under the Umbrella Policy were made *after* the policy was purchased, and indeed after the boating accident. These post-accident statements could not act to have induced the Harrises to purchase the Umbrella Policy.

[28] The designated evidence that comes closest to supporting the Harrises' estoppel argument are the portions of Rebecca's affidavit that state that, based on Mock's statements, Rebecca believed that the Umbrella Policy provided uninsured/underinsured coverage for the Harrises' watercraft and her statement that she relied upon the information Mock provided to her in coming to her belief that the Umbrella Policy provided uninsured/underinsured coverage for the watercraft. But Rebecca's affidavit does not state that Mock told her that the

---

[10] The Harrises also refer to an email Mock sent to Rebecca stating that the quote for the Umbrella Policy "includes uninsured/underinsured motorist up to $1M." *Id.* at 50. However, the Umbrella Policy did include such coverage, but defined the vehicles covered to exclude watercraft.

Umbrella Policy would cover *watercraft* in its provisions for uninsured/ underinsured motorist coverage. And, in contrast, Mock testified at the deposition that, prior to the accident, she never discussed uninsured/ underinsured watercraft coverage with the Harrises, nor did she ever tell the Harrises, prior to the accident, that the Umbrella Policy would cover uninsured/underinsured watercraft claims. *Id.* at 201–02.

[29] Under these facts and circumstances, we cannot say that there is a genuine issue of material fact regarding the question of whether Mock misrepresented the extent of the coverage of the Umbrella Policy to the Harrises, thereby inducing them to purchase coverage that did not cover the risk. Rebecca's affidavit does not establish that Mock told the Harrises that the Umbrella Policy would cover uninsured/underinsured *watercraft*, and Mock's deposition testimony clearly states that she never informed the Harrises that the Umbrella Policy would provide uninsured/underinsured *watercraft* coverage. Because Mock's (incorrect) statements that the Umbrella Policy provided uninsured/ underinsured *watercraft* coverage came after the issuance of the policy, there can be no estoppel, because such statements could not induce the insureds to purchase the policy. *See Everett Cash Mut. Ins. Co. v. Taylor*, 904 N.E.2d 276, 280–81 (Ind. Ct. App. 2009), *trans. granted, opinion vacated on other grounds,* 926 N.E.2d 1008 (Ind. 2010) (holding insurance agent's statements to insureds that policy would cover the insured's claims were insufficient to support a claim of

estoppel because they occurred after the accident);[11] *see also Am. Hardware Mut. Ins. Co. v. BIM, Inc.*, 885 F.2d 132, 140 (4th Cir. 1989) ("[T]he principles of estoppel and waiver do not operate to extend . . . coverage . . . after the loss has been sustained.").

[30] We find the Harrises' reliance on *Earl v. State Farm Mutual Insurance. Co.*, 91 N.E.3d 1066 (Ind. Ct. App. 2018), *trans. denied*, to be misplaced. In *Earl*, the insured was injured in a hit-and-run accident, and he and his wife sought uninsured/underinsured motorist coverage from their insurer, State Farm. The insurer initially offered to settle the claim for $40,000, but the insureds rejected the offer, and the matter proceeded to litigation. During discovery, the insurer incorrectly asserted that the insureds had coverage only under the uninsured/underinsured motorist provision of an auto policy with a limit of $250,000 and did not mention that the insureds also had a personal liability umbrella policy that had uninsured/underinsured motorist coverage with a limit of $2,000,000. The trial court admitted evidence of the $250,000 limit at trial, and the jury returned a verdict in the insureds' favor in the amount of $250,000. When the insureds later learned of the larger limit under their umbrella policy, they sought to appeal the jury's award, arguing that the

---

[11] We acknowledge that the opinion of this court in *Taylor* was vacated by our supreme court's grant of transfer. However, our supreme court decided the case on other grounds and did not disapprove of this portion of our holding. Moreover, we agree with this portion of *Taylor* and therefore adopt its logic as our own. Indeed, we fail to see how an insurance agent's statements *after* the policy has been issued could be said to have induced the insured to purchase the policy.

admission of the policy limits was improper[12] and also brought a separate suit against State Farm for fraud, constructive fraud, bad faith, and breach of contract. The trial court subsequently granted summary judgment in favor of the insurer, concluding *inter alia* that the insureds could not reasonably rely on State Farm's representations.

[31]     On appeal, this court reversed. With regard to the issue of reliance, we noted the traditional rule that reliance is not justified where the insured has a written instrument available and fails or neglects to read it. *Id*. at 1075 (*Plohg v. NN Investors Life Ins. Co. Inc.,* 583 N.E.2d 1233, 1237 (Ind. Ct. App. 1992), *trans. denied*). However, we further noted that "whether a party's reliance upon an [insurance] agent's representations is reasonable even though he failed to exercise the opportunity to read the policy is a question of fact for the factfinder." *Id*. (quoting *Plohg*, 583 N.E.2d at 1237). We also observed that "[g]iven the complexity of today's insurance contracts we cannot say as a matter of law, that such reliance [on the statements of an insurance agent is] unjustified." *Id*. (quoting *Medtech Corp. v. Indiana Ins. Co.*, 555 N.E.2d 844, 850 (Ind. Ct. App. 1990), *trans. denied*). Because of the complexity of the umbrella policy, the *Earl* court held that there was a genuine issue of material fact regarding whether the insured reasonably relied on the insurer's statements that there was only coverage under the auto policy. *Id.* at 1076.

---

[12] Our supreme court ultimately affirmed the trial court on this evidentiary issue. *See id.* at 1070 (citing *State Farm Mut. Auto. Ins. Co. v. Earl*, 33 N.E.3d 337, 344 (Ind. 2015)).

[32] We find *Earl* inapplicable under the facts of the present case. Here, the question is not whether an umbrella policy exists, which was the misrepresentation at issue in *Earl*. Here, the question is whether the Umbrella Policy provides coverage. As we explained above, Mock's representations that the Umbrella Policy provided coverage for uninsured/underinsured *watercraft* were made only after the accident and therefore could not have induced the Harrises to purchase the policy.

[33] The case of *Medtech*, cited by the Harrises, is also inapplicable. At issue in that case was a claim of promissory estoppel, actual and constructive fraud, and breach of duty by an agent. The claim against the insurance company was decided in the insurance company's favor on summary judgment, and the opinion provides no support for the Harrises' claim that an insurer's agent may bind the insurer to coverage that is explicitly excluded by the language of the policy.

[34] The Harrises' citation to *Plohg* is similarly unavailing. In that case, the insurance agent misinformed the insured that the exclusions listed in a sample policy were the only ones that would be included in the policy. When the insured purchased the policy, he believed that there would be no exclusion for an accident arising out of intoxication because this exclusion was not listed in the sample policy provided to him, but it was included in the actual policy issued to him. After the insured's claim for coverage was denied under the alcohol exclusion, the insured filed a suit against the insurer and the agent claiming constructive fraud.

On appeal, the issue was whether the insured was entitled to rely upon the agent's statements regarding the exclusions. We noted the "traditional rule" that "reliance is not justified where the injured party has a written instrument available and fails or neglects to read it." *Id.* at 1237 (citing *Robinson v. Glass*, 94 Ind. 211 (1883)). However, the *Plohg* court noted that the complex nature of insurance policies justifies a deviation from this traditional rule under some circumstances, and that the reasonableness of an insured's reliance is a question of fact. *Id.* In contrast to the present case, the statements made by the agent in *Plohg* were made prior to the issuance of the policy and therefore induced him to purchase the policy. Here, there could have been no such reliance on Mock's post-issuance statements.

The Harrises' citation to *Wiggam v. Associates Financial Services*, 677 N.E.2d 87 (Ind. Ct. App. 1997), *trans. denied*, is also of no avail. In that case, the court, citing *Medtech,* acknowledged that "when an insurance agent makes oral representations about the content or effect of a complex insurance policy which actually contradict the express terms of the policy, an insured's reasonable reliance upon those representations may override the insured's obligation to read and be familiar with the terms of the policy." *Id.* at 90–91. However, the *Wiggam* court distinguished *Medtech* and held that the borrower could not prevail in his suit against the lender and credit insurer for breach of contract, negligence, fraud, and promissory estoppel. *Id.* at 91–92. The *Wiggam* court held that even if the lender's agent had made an oral assurance of coverage, the general rule that one is bound to know and understand contents of his contracts

applied, and the exception to this rule did not apply given the short, simple, and unambiguous nature of the loan application, which clearly showed that the borrower affirmatively opted to not purchase credit disability insurance. *Id*. at 92. Here, although the Umbrella Policy is larger than the two-page credit application at issue in *Wiggam*, the language of the Umbrella Policy is clear and unambiguous, and *Wiggam* does not support the Harrises' position that Safeco should be estopped from denying coverage based on the actions of its agent Mock.

[37] We also find the Harrises' reliance on *Filip v. Block*, 879 N.E.2d 1076 (Ind. 2008), to be misplaced. In that case, the Filips purchased an apartment complex and obtained a commercial insurance policy from an insurance agent, Block, who had obtained insurance for the prior owner. The Filips told Block that they wanted the same coverage that the former owner had. Although Block knew that the Filips lived in the apartment complex, the policy she obtained did not cover non-business personal property, and there was no separate tenant's policy. When a fire destroyed much of the complex, a substantial part of the Filips' loss was uninsured. The Filips then sued Block and her agency, alleging negligence in the selection of the insurance.

[38] On appeal from the trial court's grant of summary judgment in favor of the defendants, our supreme court observed that "'reasonable reliance upon an agent's representations can override an insured's duty to read the policy.'" *Id*. at 1084 (quoting *Vill. Furniture, Inc. v. Assoc. Ins. Managers, Inc.*, 541 N.E.2d 306, 308 (Ind. Ct. App. 1989)). This exception to the general duty to read the policy

acts to negate an insured's duty to read part of the policy if an agent insists that a particular hazard will be covered. *Id*. Applying this rule to the facts before it, the *Filip* court held that there was nothing in the designated evidence that presented a genuine issue of material fact as to whether Block made any representations regarding the adequacy of the business property coverage, the building coverage, or the lack of business interruption coverage. *Id*. These shortcomings of the policy were readily ascertainable by the Filips from the policy itself. *Id*. However, with regard to the lack of coverage for non-business personal property, the court held that there was designated evidence that both the Filips and Block believed that the policy covered the Filips' personal property. The court noted that Mrs. Filip testified that Block told her that their property would be covered at the time the policy was issued. *Id*. at 1085.

[39] Here, there was no designated evidence that Mock told the Harrises that their watercraft would be covered by the uninsured/underinsured motorist provision of the Umbrella Policy at the time the policy was issued. Mock's representations to that effect came only after the accident occurred and, as discussed above, could not act to estop Safeco from denying coverage. Moreover, Rebecca's averments that she believed that the uninsured/underinsured provision of the Umbrella Policy would cover her watercraft after speaking with Mock is insufficient to establish that Mock actually told her that such coverage would exist, and Mock specifically denied having told the Harrises that such coverage would exist prior to the issuance of the policy.

Ultimately, Rebecca's affidavit avers that she asked for uninsured/underinsured watercraft coverage, and believed the Umbrella Policy would provide coverage, but makes no claim that Mock told her that the Umbrella Policy would provide such coverage before the policy was issued. Instead, the evidence shows that Mock mistakenly stated that the Umbrella Policy would provide coverage only after the issuance of the policy and after the accident. This, as noted, is insufficient to establish estoppel.

## Conclusion

The trial court properly granted summary judgment in favor of Safeco because the language of the Umbrella Policy clearly excludes claims for personal or bodily injury to an insured and because the Harrises failed to support their claim that Safeco should be estopped from denying coverage based on Mock's statements regarding coverage.

Affirmed.

Bailey, J., and Bradford, J., concur.